**SIXTH DIVISION**
**December 11, 2009**

No. 1-08-1728

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) Cook County. | |
| | ) | |
| v. | ) | Nos. 02 CR 14952 |
| | ) | |
| ROBERT KELLY, | ) | Honorable |
| | ) | Vincent Gaughan, |
| Defendant, | ) | Judge Presiding. |
| | ) | |
| _____ ) | | |
| | ) | |
| CHICAGO SUN-TIMES, INC., TRIBUNE CO. | ) | |
| and ASSOCIATED PRESS, | ) | |
| | ) | |
| Intervenors-Appellants. | ) | |
| | ) | |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

In this appeal, members of the media claim that their first amendment right

to freedom of speech was violated. Specifically, they claim that a trial court erred:

(1) when it sealed certain pretrial proceedings and records during the criminal

prosecution of Robert Kelly; and (2) when it issued a "Decorum Order" which restrained the speech of the attorneys and witnesses in the R. Kelly case. The sealed proceedings concerned mainly two topics: proposed questions for potential jurors, and a motion by the state requesting the trial court for permission to introduce evidence of other criminal acts by the defendant.

On April 22, 2008, the Chicago Sun-Times, Inc. (Sun-Times), the Tribune Company (Tribune) and the Associated Press (collectively, the media intervenors)[1] filed an "emergency motion" (1) to intervene in the criminal case against defendant Kelly; (2) to obtain access to certain closed pretrial proceedings and records; and (3) to vacate the Decorum Order. While the trial court granted their petition to intervene, it denied their motion for access to the closed proceedings and documents, and their motion to vacate the "Decorum Order."

The subject of this appeal is the trial court's order, entered May 16, 2008, which denied their motion. The appellants are the media intervenors; and the appellee is the State of Illinois. Robert Kelly, the defendant in the underlying

---

[1]Although the emergency motion was filed only by the Sun-Times and the Tribune, the Associated Press must have joined the motion shortly after its filing, since an order dated April 24, 2008, refers to the motion as the motion of all three media intervenors.

criminal case, was acquitted; and he is not a party to this appeal. Kelly was described in an affidavit by a Tribune reporter as "a prominent entertainer," and this case was described as one that had "been the subject of news coverage for years."

For the following reasons, we affirm the trial court's orders. We find: (1) that a petition to intervene was the appropriate vehicle to seek access to sealed court proceedings and records; (2) that appellate jurisdiction under Supreme Court Rule 307 was proper to review the trial court's order denying access; (3) that the public interest exception to the mootness doctrine allows us to hear this appeal; (4) that we review de novo the question of whether a presumption of access applies to this type of proceeding, and we review for an abuse of discretion the trial court's balancing of competing interests and determining the appropriate parameters of closure; (5) that the presumption of access did not apply to the pretrial proceedings and documents at issue here; (6) that, even if the presumption did apply, the trial court did not abuse its discretion in denying access; and (7) that the trial court did not abuse its discretion by entering the Decorum Order.

## BACKGROUND

In June 2002, the State of Illinois charged Robert Kelly with multiple counts

of child pornography. At the heart of these charges were the State's allegations that defendant Kelly made a videotape of sexual acts between himself and a minor. After close to six years of continuances, Kelly's jury trial was scheduled to begin on May 9, 2008. The jury trial resulted in an acquittal, when the jury found Kelly not guilty of the charges.

### (1) Procedural History

The relevant procedural history is summarized below. The closed proceedings, the decorum order, and the order appealed from are described in greater detail, with each topic described in its own section. In addition, there is also a section describing the documents missing from the record.

With the jury selection set to commence on May 9, 2008, the State filed, on April 1, a pretrial motion to allow evidence of other crimes, which was filed under seal. On April 11, 15 and 21, the trial court held pretrial hearings, which it closed to the public. On April 22, the media intervenors filed their motion (1) to intervene, (2) to obtain access to the three previously closed hearings, (3) to obtain access to the hearing scheduled for April 25, and (4) to vacate the Decorum Order. When the parties appeared in court on April 24, both the State and the prosecution requested time to respond to the intervenors' motion.

No. 1-08-1728

On April 24, the trial court granted the intervenors' motion to intervene but denied their motion for the <u>immediate</u> release of the transcripts of the previously closed hearings and for the opening of the April 25 hearing. The April 24 order also set the matter for hearing on May 8. In open court on April 24, the trial court stated:

> "If I articulated and made a factual basis out of why the hearings were sealed, then I would be telling you everything.
>
> So I have to use conclusions, and one of those would be it's [<u>sic</u>] for the protection of the selection of the jury. But I am not making any decisions on that right now[,] on the motion.
>
> * * *
>
> Again, I can't disclose the factual basis without disclosing the whole thing. So it actually is because of the proximity of jury selection, which is in about two weeks, and the chance that this might deprive Mr. Kelly of a fair trial. Those are the generalized basis. Again, I

5

can't make the factual basis."

Before the motion was scheduled to be heard before the trial court, the media intervenors filed, on April 28, an emergency motion with the Illinois Supreme Court, entitled "Emergency Motion for Supervisory Order Pursuant to Supreme Court Rule 383 To Unseal Court Records and Proceedings and Related Relief."

On May 2, defendant Kelly filed his "Objections" to the intervenors' motion before our supreme court. Defendant Kelly objected both to unsealing the transcripts of the closed proceedings and to vacating the decorum order, on the ground that these actions would endanger his right to a fair trial. Defendant Kelly stated that the case had received "world-wide publicity," and in support, he quoted a front-page, Chicago Tribune article that stated: "More than 330 reporters have expressed interest in covering the case with news agencies from as far away as France, Japan, Australia and England indicating they'll attend." The article, which was attached as an exhibit to defendant Kelly's objections, stated that a "[c]elebrity-obsessed culture will turn its eyes toward the R. Kelly trial next month" and that "hordes of reporters and cameramen [are] expected to descend" on the courthouse. Defendant Kelly also observed that the trial court was striking

"a balance," since it had previously denied the motions of both the defense and the prosecution to prohibit the public from viewing the videotape in open court.

On May 5, 2008, the Illinois Supreme Court denied the intervenors' motion for a supervisory order. After the supreme court's denial, defendant Kelly renewed his objections before the trial court. On May 6, the State filed its response, opposing the intervenors' motion. On May 16, the trial court issued its order denying the intervenors' motion to obtain access and to vacate the Decorum Order. On June 10, the media intervenors filed a notice of appeal which appealed the May 16 order, but which did not seek an expedited appeal. This appeal followed.

### (2) Documents Missing from the Appellate Record

This appeal concerns: four closed pretrial hearings, with the first closed hearing occurring on April 11; and certain documents, which were filed under seal and were sought in the intervenors' April 22 motion.

The record on appeal is missing certain documents. First, it does not contain the documents, filed under seal, that were sought by the intervenors, namely, the State's other-crimes motion, its supplemental answer, or the witness lists. Second, it does not contain the transcript of the public portion of the April 11

No. 1-08-1728

hearing.[2]  In their brief to this court, the media intervenors stated that, on April 11, "the public was ejected from the courtroom." Presumably, if the public was ejected, then there had already occurred a public portion, for which we are lacking a transcript. The April 11 transcript in the record states that it is an "excerpt." The missing transcript may be significant, if the trial court made findings in open court, prior to closing the first proceeding.

During oral argument before the appellate court on October 29, 2009, the appellate court asked the assistant State's Attorney to list the times that the trial court made findings concerning closure. The assistant State's Attorney began:

"On the 11th, and it is in the record, the April 11,

2008 record at [page] 5. Prior to the April 11th closure,

the court stated, in open court, the motion filed under

seal was a matter that could affect the jury pool."[3]

---

[2]The state's appellate brief states that proceedings were held "in open court" on April 22, when the media intervenors filed their motion to intervene and to obtain access. The record on appeal does not contain the transcript from the open April 22 proceeding.

[3]Earlier in the oral argument, the assistant state's attorney had described the trial court's statement, as follows: "The court made a statement in that [April 11] hearing that this is closed due to the impact that it could have on the jury."

8

In the above quote, when the assistant State's Attorney referred to a page number in the "record." She was not referring to the appellate record. In the ensuing colloquy, the assistant State's Attorney described a statement made by the trial court on April 15 that appeared "at the record at 8"; that statement appeared not on page 8 of the appellate record, but on page 8 of the individual transcript for the April 15th proceeding. Similarly, when she described a statement made by the trial court on April 24 that appeared "in the record at 10," that statement appeared not on page 10 of the appellate record, but on page 10 of the individual transcript for the April 24th proceeding. Presumably then, when the assistant State's Attorney observed, in the above quote, that the trial court made a finding in "the April 11, 2008 record at 5," she was referring to page 5 of the transcript of the open portion of the April 11th proceeding. She made this reference without apparently realizing that this transcript had not been provided to us in the appellate record.

(3) The Closed Proceedings and Records

As noted, the trial court closed four pretrial hearings, on: (1) April 11, 2008; (2) April 15, 2008; (3) April 21, 2008; and (4) April 25, 2008. The first three hearings were comprised of argument from and discussions with counsel. Only

the last hearing, on April 25, involved a witness. As noted, the media intervenors' April 22 motion also sought the following documents, which were filed under seal: (1) the State's pretrial motion to allow evidence of other crimes, filed April 1, 2008; (2) the State's supplemental answer to discovery; and (3) both parties' witness lists. [4]

At the beginning of the excerpt of the April 11 proceeding contained in the appellate record, the attorneys for the prosecution and the defense stated their names for the record, and the trial court observed that the only other persons present were "my deputies and my clerk and our court reporter and my staff attorneys."

The closed portion of the proceeding on April 11 concerned two topics: (1) the State's motion to use evidence of other crimes; and (2) proposed questions for potential jurors. The trial court heard argument from counsel concerning the State's motion, and discussed jury questionnaires with counsel. As noted, neither

---

[4]In their appellate brief, the media intervenors alleged that the lawyers for the state and the defendant met with the trial judge in chambers and without a court reporter, on several dates prior to trial. Defendant Kelly stated in his "Objections" that these meetings were merely "case management conferences" and that, with the exception of the proceedings now at issue, all "arguments, rulings and hearings on pretrial motions have occurred in open court."

side called witnesses or introduced evidence.

During the April 11 proceeding, the prosecutor argued that, since the defendant had placed at issue the identity of the male depicted on the videotape, the State sought to introduce evidence of other uncharged acts. As part of her argument, the prosecutor stated the names of the individuals involved in the uncharged acts, including the name of the minor. She explained why their identity was important to proving the charged offense, and she discussed the similarities between the charged and uncharged acts. The prosecutor also observed that, as part of the State's motion, the State had submitted a chart detailing the similarities, to show that the acts were "distinct and unusual." Defense counsel also discussed the acts, arguing that they were not similar. After listening to counsel's argument, the trial court held that the uncharged acts was admissible.

Prior to closing the courtroom on April 15, the trial court and counsel discussed which attorneys would be representing the parties at trial. Still in open court, the trial court observed that "today was up for additional questions for the jury questionnaire" and for a motion that was filed under seal. In open court, the trial court explained that the motion was filed under seal "because of the proximity

of Mr. Kelly's case going to trial." Then the trial court stated that there would be a short recess to "clear the court and do the proceedings that have to be sealed."

The closed hearing on April 15 concerned primarily: questionnaires for the potential jurors; and the State's reiteration of its proffer of other crimes evidence, and the defense's anticipated response to it. Specifically, counsel and the trial court discussed the defense's anticipated cross-examination concerning a witness' attempt to obtain money from the defendant in exchange for a videotape. The State also proffered that this same witness met with an attorney, that she did not tell the attorney about sex acts with the minor victim, and that she then received the rest of the money that had been promised to her.

The closed April 21 hearing concerned primarily the jury questionnaires. The defense proposed seven questions, such as whether the jurors had any "feelings" which might affect their judgement in this case, concerning "lesbian sexual activity," or "three-way sex, man and two women," or sex acts by a minor "with another woman and a man while being videotaped," or adultery, or urination on another person.

At the closed April 25 hearing, the trial court heard from a witness, who was depicted on the videotape, but who was not the minor. Before hearing from the

witness, defense counsel stated his reasons for seeking to close the hearing. He stated, in part, "we have a concern that we are on the eve of jury selection and given the nature of the allegations which involve alleged sex with a minor as well as a three-way sexual contact that if that type of information were leaked [to the public] before the trial it would poison the jury pool"; and that voir dire questions alone would not "protect" the defendant. Defense counsel also remarked that the front page of that day's Chicago Tribune contained photographs of the defendant, the trial judge and other participants in the case.

On April 25, the trial court also elaborated on his reasons for closure:

"Part of my findings are the same as what [defense counsel] and the State has agreed with is that the motion for proof of other crimes elicited testimony concerning the participation in different sex acts with a minor. So that is one of the primary reasons why these proceedings have been sealed. The others are that you all are aware that certainly this trial is under great public scrutiny. In fact, the Tribune this morning, and usually I don't read the papers but someone pointed it out to me, Miss Stacy

13

St. Clair reported that over 330 news organizations have shown interest in getting credentials. So certainly this is a very high profile file. And as we speak there is somebody from an agency, which I will pronounce it, Agence France-Presse, a Miss Mira Oberman, who provides press service for overseas media. Also as brought out there have been inquiries from Australia, France, Japan and there was another country I forgot which one. So this has drawn international as well as national scrutiny.

With the proximity of the jury selection happening also within two weeks it is important that the jury pool not be contaminated or prejudiced unduly by this type of publicity. Those are the reasons why these hearings are sealed."

Like the prior hearings, the April 25 hearing also concerned the jury questionnaires; but unlike the prior hearings, this hearing also concerned testimony by a witness. The purpose of taking the testimony was to establish that

one of defendant's attorneys did not have a potential conflict of interest. The trial court asked the witness a few questions that established that she had received money "in exchange for an item," but that the attorney was not involved. The trial court then ruled that there was no conflict of interest. There was no cross-examination, and only the trial court examined the witness.

### (4) The Decorum Order

On June 22, 2007, the trial court issued an order that the trial court and the parties to this case refer to as the "Decorum Order." The order was never challenged by the parties to the underlying criminal action, namely, the State and defendant Kelly, or by the witnesses, to whom the order also applied. The order was contested only by the motion of the media intervenors, filed almost a year later, on April 22, 2008.

The Decorum Order stated that it applied only to: (1) the attorneys "connected [with] this case as Prosecutor or Defense Counsel," "any other attorney working in or with the offices of either of them," and "their agents, staff, or experts," (2) "any judicial officer or court employee," and "any law enforcement employee of any agency involved in this case," and (3) "any persons subpoenaed or expected to testify[] [in] this matter."

No. 1-08-1728

The Decorum Order prohibited these individuals from doing any of the following acts:

"(1) Release or authorize the release for public dissemination of any purported extrajudicial statement of either the defendant or witnesses relating to this case;

(2) Release or authorize the release of any documents, exhibits, photographs or any evidence, the admissibility of which may have to be determined by the Court;

(3) Make any statement for public dissemination as to the existence or possible existence of any documents, exhibits, photographs or any evidence, the admissibility of which may have to be determined by the Court,

(4) Express outside of court an opinion or make any comment of public dissemination as to the weight, value, or effect of any evidence as tending to establish guilt or innocence;

16

(5) [M]ake any statement outside of court as to the

content, nature, substance or effect of any statements or

testimony that have been given or is expected to be given

in any proceeding relating to this matter;

(6) Issue any statement as to the identity of any

prospective witness, or the witness's probable testimony,

or the effect thereof;

(7) Make any out-of-court statement as to the

nature, source or effect of any purported evidence

alleged to have been accumulated as a result of the

investigation of this matter."

(5) The Order Appealed From

The media intervenors appealed from the trial court's order, entered on May 16, 2008. The May 16 order is an eight-page and detailed order, denying the media intervenor's motion to unseal the transcripts of the closed proceedings, and to vacate the Decorum Order. Previously, on April 24, 2008, the trial court had granted the media intervenors's petition to intervene, but had denied their motion for the immediate release of the transcripts of the previously closed hearings and

for the opening of the April 25 hearing. The April 24 order, however, was not named in the intervenors' notice of appeal.

Since the May 16 order was issued after the four hearings had already been held, the focus was on whether the transcripts of the closed hearing should remain sealed. In the May 16 order, the trial court stated that, prior to the start of hearings on the State's other-crimes motion, "detailed and specific findings were made on the record demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." The trial court observed that, although it sealed these findings, they were available to a reviewing court. The trial court stated that "the justification for closure will once again be articulated here, exclusive of any facts which necessitate the closure at issue."

The May 16 order stated that "closure is necessary to protect the minor victim and the defendant's right to a fair trial by ensuring the jury will not be exposed to inadmissible or highly prejudicial evidence." The trial court found that the concern over widespread publicity in the case at bar was not speculative, considering that (1) "over 330 reporters, both here and abroad, *** have applied for media credentials to cover the trial"; and (2) "the case has been on the front page of both major Chicago area publications numerous times in the last three

18

weeks." In a footnote, the trial court stated that the major publications to which it referred were the Chicago Sun-Times and the Chicago Tribune, who were also media intervenors.

The order stated that the sealed transcripts would be made available to the media intervenors after either trial or sentencing. Since the trial ended in an acquittal, the transcripts were made available after the trial.

In the May 16 order, the trial court considered various alternatives to sealing the transcripts, such as: (1) redacting then; (2) using pseudonyms; (3) questioning potential jurors during voir dire concerning pretrial publicity; and (4) changing the venue of the trial. However, the order explained why these alternative would not work. First, the trial court, who was thoroughly familiar with the contents of the transcripts, found that "redaction or use of pseudonyms would result in "a collection of unintelligible nonsense or a concession of the information justifying closure." Second, the trial court found that neither voir dire nor a venue change could protect the defendant's right to a fair trial, in light of (1) "the highly prejudicial" details of the crime contained in the transcripts, and (2) the "onslaught of pre-trial publicity" generated by the "celebrity of the defendant." The trial court found that, if the information was released, changing the trial's location

would do nothing to reduce the resulting prejudice, since this was a case of "nationwide interest." In addition, "the likelihood of extensive jury contamination" was even greater, since the trial was scheduled to begin soon. Based on these findings, the trial court found that the various possible alternatives would not work, due to the specific facts and circumstances of this case.

In the May 16 order, the trial court also refused to vacate the Decorum Order, entered nearly a year before. The trial court stated that the order was an exact "replica" of the order entered in a high-profile criminal case against celebrity Michael Jackson (People v. Jackson, No. 11336003 (2004)), and of an order that the trial court had used in a 2007 case (People v. Luna, 02 CR 15430 (2007)). The media interevenors had claimed that the order constituted a prior restraint upon freedom of speech. The trial court held, first, that the order "does not place any restraints whatsoever upon the press," since it "governs the conduct of the attorneys and parties only." The trial court observed that neither the defendant nor the State had asked for the order to be lifted. The trial court found, second, that even if the order was a prior restraint, it was needed to protect the defendant's right to a fair trial, in light of the "torrent of media interest in this case."

On June 10, 2008, the media intervenors filed a notice of interlocutory

No. 1-08-1728

appeal, appealing from the trial court's May 16 order. This appeal followed.

ANALYSIS

This appeal raises a number of preliminary issues: (1) the appropriate suit or motion to be brought by the press in order to obtain access to closed court proceedings; (2) the propriety of appellate jurisdiction under Supreme Court Rule 307 (188 Ill. 2d R. 307) to review a trial court's order denying access; (3) the possible mootness of a denial of access, where the criminal trial at issue has already concluded, and access has since been granted; and (4) the appropriate standard of review for a trial court's order denying access to the press.

After deciding these preliminary issues, we may proceed to the question of whether the trial court's order violated the public's right of access by closing certain proceedings and sealing certain records. The public has three different claims to a right of access. People v. Pelo, 384 Ill. App. 3d 776, 780-81 (2008). First, there is a constitutional right of access, grounded both in the first amendment to the federal constitution and in the first article of our State constitution. U.S. Const., amend. I ("Congress shall make no law *** abridging the freedom *** of the press"); Ill. Const. art. I, §4 ("All persons may speak, write and publish freely ***"); Pelo, 384 Ill. App. 3d at 780. Second, in addition to the

21

constitutional right of access, there is a "parallel common-law right of access," recognized by the Illinois Supreme Court. Pelo, 384 Ill. App. 3d at 780, citing Skolnick v. Altheimer & Gray, 191 Ill. 2d 214, 230 (2000). Third, there is a statutory right of access, created by our State legislature, as part of the Illinois Clerks of Courts Act. 705 ILCS 105/16 (6) (West 2008); Pelo, 384 Ill. App. 3d at 781.

Finally, we must decide whether the trial court's decorum order constituted an unconstitutional prior restraint on free speech.

(1) Procedure and (2) Jurisdiction

We find both (1) that a petition to intervene was the appropriate vehicle to seek access to sealed court proceedings and records; and (2) that appellate jurisdiction under Supreme Court Rule 307 was proper to review the trial court's order denying access.

In the case at bar, for the purpose of obtaining access to sealed court records and proceedings, appellants Sun-Times and Tribune filed an "emergency motion" to intervene in the criminal case against defendant Kelly

Instead of filing a motion to intervene in the criminal case, appellants could have tried filing a separate civil action, seeking a declaratory judgment. 735 ILCS

22

5/2-701 (West 2008) (providing for actions seeking a declaratory judgment). In Pelo, the appellate court observed that some jurisdictions find intervention to be the proper vehicle for the press to assert a right of access in a criminal case, while other jurisdictions find that a separate civil action is more appropriate. Pelo, 384 Ill. App. 3d at 779-80, citing State v. Cianci, 496 A.2d 139, 146 (R.I. 1985) (holding that intervention "has no place in a criminal case," while also conceding that other jurisdictions find intervention to be the proper vehicle for the press to assert a right of access). The Pelo court stated: "Illinois seems to be one of those jurisdictions that takes interlocutory appeals concerning right-of-access cases." Pelo, 384 Ill. App. 3d at 780. In support of its "seems to be" statement, the Pelo court cited one case: People v. LaGrone, 361 Ill. App. 3d 532 (2005). In LaGrone, the trial court granted the media intervenors' petition to intervene in the criminal case, but denied their petition for access. LaGrone, 361 Ill. App. 3d at 533-34. On review, the appellate court reversed the trial court's denial of access, but without discussing whether intervention was the proper vehicle. LaGrone, 361 Ill. App. 3d at 538. Neither LaGrone nor Pelo is dispositive on the issue of whether intervention is proper, since LaGrone never reached the issue and Pelo's "seems to be" statement is far from definitive.

While the parties before us did not brief the issue of whether intervention is proper, they did brief the issue of whether an interlocutory appeal was proper pursuant to Supreme Court Rule 307. 188 Ill. 2d R. 307. The two issues are intertwined. If we are going to permit intervention, then we need to also permit some path to review. It cannot be that important first amendment issues are decided by trial courts and then insulated from further review. That makes no sense. LaGrone, 361 Ill. App. 3d at 538 (appellate court reversed where trial court failed to meet "the rigorous standard" required by the first amendment to close a proceeding); A.P., 354 Ill. App. 3d at 1003 (appellate court reversed where "the trial court abused its discretion by sealing the entire court files"); Johnson, 232 Ill. App. 3d at 1075 (appellate court reversed where "trial court abused its discretion by denying access").

We find that, in Illinois, intervention is the proper vehicle. First, we were not able to locate, after diligent searching, any Illinois case in which a media plaintiff employed a declaratory action to obtain access to sealed court records or proceedings. Second, we did find cases which seemed to indicate that a declaratory action was not the correct vehicle. Pelo, 384 Ill. App. 3d at 780 (Illinois "seems to" prefer intervention over declaratory actions). C.f. Matchett v.

24

Chicago Bar Association, 125 Ill. App. 3d 1004, 1009 (1984) (declaratory action could not be used to force the Chicago Bar Association to publish its reasons for not recommending a judicial candidate). Third, we did locate a number of Illinois cases where a media party, faced with the same issue, was allowed to intervene in both criminal and civil cases. Pelo, 384 Ill. App. 3d at 777 (affirming the trial court, which had "granted [the newspaper's] petition to intervene but denied access" to the transcript at issue in a criminal case); LaGrone, 361 Ill. App. 3d at 533 (reversing the trial court, which had denied access to the media intervenor in a criminal case); Coy v. Washington County Hospital District, 372 Ill. App. 3d 1077, 1077-79 (2007) (affirming the trial court which had granted the newspaper's petition to intervene in a civil case, but denied access to the patient names at issue); A.P. v. M.E.E., 354 Ill. App. 3d 989, 990-91 (2004) (reversing the trial court, which had denied access to the media intervenor in a civil case); In re Marriage of Johnson, 232 Ill. App. 3d 1068 (1992) (reversing the trial court, which had denied access to the media intervenors in a civil case).

Last, but not least, intervention has advantages from a policy standpoint, over a declaratory action. With intervention, the judge in the criminal trial, who is already familiar with the reasons favoring or disfavoring disclosure, is the judge

who decides the disclosure issue. <u>Pelo</u>, 384 Ill. App. 3d at 778, 784 (affirming the trial court's reasons for denying access). By contrast, with a declaratory action, a civil judge would have to start from scratch, learning the pros and cons of disclosure in a criminal case. <u>Cianci</u>, 496 A.2d at 146 n.5 (the civil judge would review "the case anew"). With intervention, the criminal defendant, who has an interest in the disclosure issue, is already before the court, with counsel. By contrast, with a declaratory action, the criminal defendant may be forced to retain counsel to intervene in the civil suit. With intervention, a media party may intervene after a criminal defendant has filed a motion to close proceedings. <u>LaGrone</u>, 363 Ill. App. 3d at 533 (media parties were allowed to intervene after defendant filed a motion to file proffers of evidence under seal). With a declaratory action, you run the risk of inconsistent rulings, when a criminal judge grants the defendant's motion to close proceedings, but a subsequent civil judge rules that the first amendment rights of the press require their opening. <u>Cianci</u>, 496 A.2d at 146 n.5 (a civil court in a declaratory action may "question the case anew since it would not be controlled by the doctrine of the law of the case").[5]

---

[5]In <u>Cianci</u>, the Supreme Court of Rhode Island held that a declaratory action was superior to intervention, because the media's rights could be "fully adjudicated" in a declaratory action "without interfering with or interrupting the

With intervention, the judge in the criminal trial may change or amend his or her interlocutory disclosure orders, as the needs of the case and the evidence unfolds. Pelo, 384 Ill. App. 3d at 778 (the trial court noted that its ruling on access could change as the evidence unfolded). By contrast, in a separate declaratory action, the declaratory judgement is a final order, rather than an interlocutory order, and thus it cannot adapt to the unfolding and possibly shifting needs of a criminal case. Thus, based on case law and policy considerations, we conclude that intervention is the proper vehicle in the State of Illinois.

If intervention is the proper vehicle, then there has to be some contemplated path to review. As noted above, the first amendment questions at issue are too important to insulate them from review. The question then becomes whether the path to review is through Supreme Court Rule 307(a) or some other rule or statute. 188 Ill. 2d R. 307. Neither party has suggested another rule or statute that would be a better path to review. The media intervenors before us argue that Rule 307 review is proper; and the State argues that it is not, without offering an alternative.

---

criminal proceeding in any way." Cianci, 496 A.2d at 146. However, a civil court's order of closure or disclosure will directly interfere with the criminal trial.

No. 1-08-1728

Supreme Court Rule 307(a) provides, in relevant part:

"(a) An appeal may be taken to the Appellate Court from

an interlocutory order of court:

(1) granting, modifying, refusing, dissolving, or

refusing to dissolve or modify an injunction;"

188 Ill. 2d R. 307(a)(1).

Supreme Court Rule 307(a) (1) permits an interlocutory appeal from a trial

court order that denies or grants injunctive relief. 188 Ill. 2d R. 307(a)(1). Stating

that this rule should be construed "broadly," our supreme court held that "an

interlocutory order circumscribing the publication of information is reviewable as

an interlocutory injunctive order, pursuant to Rule 307(a)(1)." Skolnick, 191 Ill.

2d at 221; In re A Minor, 127 Ill. 2d 247, 263 (1989) ("interlocutory restraints

upon publication of information are reviewable as interlocutory injunctive orders

under Rule 307(a)(1)").

Building on the Skolnick holding, the appellate court in A.P. held that a trial

court's order denying access to a media intervenor is "in the nature of injunctive

relief, and, therefore, this court possesses the necessary jurisdiction to entertain

[an intervenor's] interlocutory appeal," pursuant to Rule 307(a)(1). A.P., 354 Ill.

28

App. 3d at 990-91, citing 188 Ill. 2d R. 307(a)(1) and <u>Skolnick</u>, 191 Ill. 2d at 221-22. Although in other cases we did not identify the basis for our appellate jurisdiction, we have regularly heard appeals from media intervenors seeking access. <u>Coy</u>, 372 Ill. App. 3d at 1079; <u>LaGrone</u>, 361 Ill. App. 3d at 534 ("[t]his interlocutory appeal followed" the trial court's denial of the media intervenor's petition for access); <u>Johnson</u>, 232 Ill. App. 3d at 1069. Presumably, the source of appellate jurisdiction in these other cases was also Supreme Court Rule 307(a). 188 Ill. 2d R. 307(a)(1). The parties do not suggest otherwise. We see no reason to abandon this long line of appellate cases, which is well-grounded in supreme court jurisprudence.

In response, the State relies on this court's decision in <u>People v. Reynolds</u>, 274 Ill. App. 3d 696 (1995). In <u>Reynolds</u>, the media intervenor (coincidentally the Chicago Tribune, as in the case at bar) claimed that this court had appellate jurisdiction, not under Rule 307 which is at issue before this court, but under Rules 301 and 304. <u>Reynolds</u>, 274 Ill. App. 3d at 697-98, citing 134 Ill. 2d 301, 304 and 307.[6] After ruling that appellate jurisdiction did not exist under Rules

---

[6]Even though Rules 301, 304 and 307 were all amended effective February 1, 1994 (155 Ill. 2d R.301, 304 and 307) and even though the petitions for access in <u>Reynolds</u> were all filed after that date, the <u>Reynolds</u> opinion cited an earlier

No. 1-08-1728

301or 304, the <u>Reynolds</u> court proceeded <u>sua</u> <u>sponte</u> to consider the possibility of jurisdiction under Rule 307. <u>Reynolds</u>, 274 Ill. App. 3d at 698. The <u>Reynolds</u> court noted that normally it would have ordered the parties to brief this question, but that since the media intervenor had moved to expedite, it would answer the question for this particular case, without the benefit of briefs. <u>Reynolds</u>, 274 Ill. App. 3d at 698.

In <u>Reynolds</u>, the trial court's order denied access to sidebar conferences during trial, but directed the release of all sidebar transcripts at the conclusion of the trial. <u>Reynolds</u>, 274 Ill. App. 3d at 696-98. The <u>Reynolds</u> court concluded that it lacked jurisdiction under Rule 307 to review the trial court's order, because the order was "ministerial and administrative," rather than injunctive as Rule 307 required. <u>Reynolds</u>, 274 Ill. App. 3d at 698-99.

The <u>Reynolds</u> court held that the order was administrative rather than injunctive, for two reasons. First, the trial court's order did not enjoin the newspaper from publishing information that it already possessed, but instead restricted the newspaper's access to court transcripts. <u>Reynolds</u>, 274 Ill. App. 3d at 699. Second, since the order only "temporarily" limited that access, it was not a

version of the rules. 134 Ill. 2d R. 301, 304 and 307.

30

permanent denial of access but was an administrative order providing "when" access would occur. Reynolds, 274 Ill. App. 3d at 698, 700. The denial was temporary, since access was denied only until the conclusion of the trial. Reynolds, 274 Ill. App. 3d at 698. In the case at bar, the State argues that Reynolds is similar because, first, the media intervenors were not enjoined from publishing information that they already possessed; and, second, they received, at the end of the trial, the transcripts of the closed proceedings.

What the State overlooks is that, in Reynolds, the Chicago Tribune did not even have the opportunity to assert its own Rule 307 arguments, since its own motion to expedite impeded its own ability to be heard. Reynolds, 274 Ill. App. 3d at 698. The jurisdictional holding in Reynolds is thus limited to the unique set of facts of that case, which involved the specific demands created by the media's own request for an expedited appeal.

Since the time of the Reynolds decision, this court has held, first, that a denial of access is injunctive in nature for purposes of Rule 307 jurisdiction. A.P., 354 Ill. App. 3d at 900-91. In addition, we have regularly permitted appeals from media intervenors seeking access, which were presumably made pursuant to Rule 307. Coy, 372 Ill. App. 3d at 1079; LaGrone, 361 Ill. App. 3d at 534;

31

Johnson, 232 Ill. App. 3d at 1069. Second, this court has found that even a temporary denial of access to court proceedings is not merely administrative, but instead raises important first amendment concerns. In LaGrone, for example, the trial court ordered the sealing of a pretrial hearing transcript, just until the completion of jury selection. LaGrone, 361 Ill. App. 3d at 534 (" 'upon selection of the jury, the transcript of this hearing will be released' "). C.f. In re A Minor, 127 Ill. 2d at 260 (even "temporary" restraining orders are reviewable under Rule 307(a)(1)). The length of denial in LaGrone was even shorter than the length of denial in Reynolds: in LaGrone, it was only to the end of jury selection, while in contrast, in Reynolds, it was until the end of the entire trial. LaGrone, 361 Ill. App. 3d at 534; Reynolds, 274 Ill. App. 3d at 698. In LaGrone, we held that even this short denial of access implicated important first amendment concerns. LaGrone, 361 Ill. App. 3d at 537 (holding that the trial court failed to make the specific factual findings needed to justify even a short denial). We did not consider this order to be merely ministerial, and we permitted the interlocutory appeal. LaGrone, 361 Ill. App. 3d at 534. See also Kemner v. Monsanto Company, 112 Ill. 2d 223, 235 (1986) (our supreme court heard a Rule 307(a)(1) appeal from a trial court's temporary gag order, which prohibited defendant from

talking to the press only " 'until judgment is entered' "). For these reasons, we do not find Reynolds dispositive of the jurisdiction issue before us.

In addition, the State attempts to distinguish A.P and Skolnick on the grounds that they involved civil cases, while this appeal involves a criminal case. A.P., 354 Ill. App. 3d at 990; Skolnick, 191 Ill. 2d at 216. However, the State fails to explain why the need to review closure orders would be less compelling in a criminal case than in a civil case – if anything, the need to review would be more compelling in a criminal case. This court has previously stressed the importance of public access to criminal trials as a way of ensuring their fairness. E.g. LaGrone, 361 Ill. App. 3d at 535 ("opening the [criminal] process to neutral observers is an important means of assuring the fairness of criminal proceedings').

In sum, on the procedural and jurisdictional issues, we find that a petition to intervene is the appropriate vehicle in Illinois for the media to seek access to closed court proceedings; that there must be some mechanism to review the important first amendment concerns raised by these petitions; that a line of appellate cases appears to have found Rule 307 to be the appropriate vehicle for review; and that we see no reason to depart from this line of precedent.

(3) Mootness

We find that the issues in this appeal are not moot, because they fall within the public interest exception to the mootness doctrine.

(a) Parties' Arguments

The State argues that the issues before this court are moot, since the media intervenors now have the transcripts to the previously closed hearings, and since the effect of the Decorum Order ceased when the underlying criminal suit concluded. Both sides acknowledge that, after the jury acquitted defendant Kelley, the trial court released the transcripts of the four closed hearings. The State claims that both the release of the transcripts and the conclusion of the underlying criminal trial make this appeal moot and require us to dismiss it.

In response, the media intervenors argue that mootness is not a bar to this appeal, because the facts of this case fall within two separate exceptions to the mootness doctrine: (1) the "public interest" exception; and (2) the "capable of repetition yet evading review" exception. In re A Minor, 127 Ill. 2d at 257-58.

In reply, the State claims that the public interest exception does not apply, because the exact issues will not recur. The State argues that the exact issues will not recur, since: (1) defendant Kelly is not subject to retrial; (2) the media

intervenors do not dispute the applicable legal rules, but only the way in which the applicable rules were applied to the facts of this case; and (3) the facts of this case were unusual since they included a media celebrity, alleged sexual activity, and a minor. The State claims that the "evading review" exception also does not apply, where the media intervenors failed to seek an expedited appeal.

(b) The Public Interest Exception

As a general rule, Illinois appellate courts will not review moot cases. In re Barbara H., 183 Ill. 2d 482, 491 (1998). A case on appeal becomes moot, when " 'the issues involved in the trial court no longer exist,' " and it is "impossible for the appellate court to grant the complaining party effectual relief." In re A Minor, 127 Ill. 3d at 255; In re Barbara H., 183 Ill. 2d at 490-91 (consideration of the issues will not affect the result and "a decision on the merits cannot result in appropriate relief to the prevailing party"). The goal of the rule is for courts to avoid hearing cases where the parties no longer have " 'a personal stake in the outcome.' " In re A Minor, 127 Ill. 3d at 255, quoting People ex. rel. Black v. Duke, 96 Ill. 2d 273, 276-77 (1983), quoting Baker v. Carr, 369 U.S. 186, 204, 7 L.Ed. 2d 663, 678, 82 S.Ct. 691, 703 (1962). Without a personal stake, parties lack the incentive to "sharpen[]" their arguments or to illustrate the issues with the

"concrete" facts of their problems; and reviewing courts depend on the parties' sharp and concrete presentation for the fullest "illumination" of the issues. In re A Minor, 127 Ill. 3d at 255, quoting Black, 96 Ill. 2d at 276-77, quoting Baker, 369 U.S. at 204, 7 L.Ed. 2d at 678, 82 S.Ct. at 703.

As with almost every rule, there are exceptions. Two exceptions to the mootness doctrine include (1) the " 'capable of repetition yet evading review' " exception; and (2) the public interest exception. In re A Minor, 127 Ill. 3d at 257-58.

To receive the benefit of the " 'capable of repetition yet evading review' " exception, the complainant must "demonstrate that (1) the challenged action is in its duration too short to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." In re Barbara H., 183 Ill. 2d at 491, quoting without quotation marks, In re A Minor, 127 Ill. 2d at 258. Since we find, as discussed below, that the public interest exception applies, we do not consider the "' capable of repetition yet evading review' "exception.

The criteria for the public interest exception are well established and not in dispute. " 'In order to fall into the public interest exception (1) the question must

36

be of a public nature; (2) an authoritative determination of the question must be desirable for the purpose of guiding public officers; and (3) the question must be likely to recur.' " Filliung v. Adams, 387 Ill. App. 3d 40, 56 (2008), quoting Brown v. Duncan, 361 Ill. App. 3d 125, 134 (2005). Applying these criteria to the facts before us, we find that the public interest exception allows us to hear this appeal.

First, the question is of a public nature, since it involves when the substance of pretrial hearings and their supporting records should be made public. Reviewing this first criterion, our supreme court held that a newspaper's "interest in the publication of newsworthy information" is an issue of "surpassing public concern." In re A Minor, 127 Ill. 2d at 257. The appellate court in LaGrone was faced with a case – like we are now – in which the trial court denied media access to a pretrial hearing, and the State claimed on appeal that the question was moot. LaGrone, 361 Ill. App. 3d at 533-34. The LaGrone court held that the question was one of "great public interest," even though the press in that case was denied access to the transcript only until the close of jury selection. LaGrone, 361 Ill. App. 3d at 534-35. If the denial of access for such a short duration qualified as "a question of great public interest," then so does a denial of access that lasted until

37

the conclusion of trial. [7]  Thus, we find that the first criterion is satisfied.

Second, the determination of this question will guide trial judges, who are public officers.   The State claims that our determination will not guide trial judges, since the media intervenors are not seeking new rules or standards, but rather are challenging only the way in which well-established rules and standards were applied to the facts of this case.

It has never been the case that appellants must seek new rules or standards in order to utilize the public interest exception, and the State does not cite a case to that effect.  Illustrating the proper way to apply existing rules to a particular fact pattern also provides guidance to trial judges who must apply those rules, not in a vacuum or to some idealized set of examples, but to ever-changing fact patterns. In LaGrone, for example, the appellate court found that the public interest exception applied, even though the media intervenors were not seeking new rules or standards, but were simply challenging the way in which the trial court had applied those rules and standards to the facts of that case.  LaGrone, 361 Ill. App. 3d at 532 ("[w]e agree with the intervenors that the trial court's specific findings

---

[7]In addition, the State in the case at bar concedes in its brief to this court that "it is true that press access to criminal proceedings is generally a question of a public nature."

do not constitute a sufficient basis for closure" under existing rules and standards).
As the appellate court did in LaGrone, we find that guidance about the proper
application of existing rules does satisfy the second criterion.

In addition, neither LaGrone, nor any of the other cases cited by the parties,
involved as famous a criminal defendant as the Kelly case did. Illinois trial courts
will benefit from appellate guidance concerning the way to handle celebrity cases.
In the case at bar, the trial court turned for guidance to the California criminal case
against the now deceased celebrity, Michael Jackson. People v. Jackson, No.
1133603 (Superior Ct. Cal. 2004). It is time to provide Illinois trial courts with
guidance based on Illinois cases and rules. For all these reasons, we find the
second criterion satisfied.

Although the State claims that none of the public interest criteria are met,
their arguments target the third criterion: the likely recurrence of the question at
issue. The State argues that the question will not recur since (1) defendant Kelly
is not subject to retrial; and (2) the facts of this case were unusual since they
included a media celebrity and alleged sexual activity with a minor.

If defendant Kelly was subject to retrial, then the question would not be
moot, because presumably the trial court would still have not released the

transcripts and the bar to access would be a continuing one. However, appellate courts have found that the public interest exception applies, without requiring a retrial to be on the horizon. LaGrone, 361 Ill. App. 3d at 535. C.f. In re A Minor, 127 Ill. 2d at 258-59 ("we do not agree that appellant must demonstrate that" the law will "be applied in precisely the same circumstances or for precisely the same reasons, for the "capable of repetition, yet evading review" exception to apply). Thus, the lack of a potential retrial in the case at bar does not bar the application of the public interest exception.

In addition, while the facts of every case are unique in certain ways, illustrating the proper way to apply the law to those facts still provides guidance to trial judges. The case at bar required the trial court, in a high profile case, to balance the public's right to know, against both the defendant's right to a fair trial and the court's desire to protect an alleged victim of then minor age. Unfortunately, this type of balancing is likely to recur in future cases. See LaGrone, 361 Ill. App. 3d at 535 ("balancing the right of the defendant to a fair trial against the public right of access" in a case where defendant boyfriend was accused of drowning his girlfriend's three young children); Pelo, 384 Ill. App. 3d at 777 (balancing rights in a case against "an accused stalker who allegedly

committed sexual assault against several different victims"); In re A Minor, 127

Ill. 2d at 251 (balancing rights where a minor was "arrested in connection with a

fatal shooting"). See also Kemner v. Monsanto Co., 112 Ill. 2d 223, 244 (1986)

(observing that the trial court had to "achieve the delicate balance between the

desirability of free discussion and the necessity for fair adjudication, free from

interruption of its processes"). Thus, we find the third criteria is also satisfied.

For the foregoing reasons, we hold that the criteria for the public interest

exception are satisfied, and thus the mootness doctrine is not a bar to our review of

this appeal.

## (4) Standard of Review

Our last preliminary issue is to determine the appropriate standard of review

for a trial court's denial of access to the press.

## (a) Parties' Arguments

The media intervenors claim that de novo is the appropriate standard of

review for the trial court's ultimate decision to deny access. They cite People v.

Rivera, 227 Ill. 2d 1 (2007), which applied a bifurcated standard of review to a

constitutional issue, though not a first amendment one. Rivera, 227 Ill. 2d at 4-5,

11 (issue concerned whether defense counsel had used peremptory challenges to

strike women from the jury). Under the Rivera standard, a reviewing court will not disturb a trial court's factual findings unless they are against the manifest weight of the evidence. Rivera, 227 Ill. 2d at 11. However, under the Rivera standard, the reviewing court will consider de novo the trial court's "ultimate" decision, made by applying the law to the trial court's factual findings. Rivera, 227 Ill. 2d at 12.

The media intervenors ask us to reject the abuse of discretion standard utilized by the appellate court in A.P. . In A.P., this court utilized an abuse of discretion standard to review whether a trial court had properly denied a motion by a media intervenor (Chicago Tribune) to unseal court records. A.P., 354 Ill. App. 3d at 994. The A.P. court held that "abuse of discretion" was the appropriate standard, "regardless of whether a purported right of access is based on the common law or the first amendment." A.P., 354 Ill. App. 3d at 994. The A.P. case concerned an asset division agreement made by the well-known Pritzker family which affected its minor children. A.P., 354 Ill. App. 3d at 990. Thus, the A.P. case, like the case at bar, involved: a media intervenor, sealed court records, a celebrity name, and minors. In the case at bar, the media intervenors do not attempt to distinguish A.P., except to say that it is a civil case, while the case at

bar is criminal. However, they offer no explanation why this difference leads to a different standard of review.

The State agrees with the media intervenors that the Rivera standard of review applies to the first amendment claim. Rivera, 227 Ill. 2d at 11. However, the State claims that the common law and statutory claims require a lesser standard of review, namely abuse of discretion; and the State cites in support In re Johnson, 232 Ill. App. 3d 1068 (1992).

However, in Johnson, the appellate court found that the abuse of discretion standard applied "[u]nder either a common law or first amendment analysis." Johnson, 232 Ill. App. 3d at 1075. In Johnson, the appellate court held that a trial court had abused its discretion, when the trial court had denied a motion by a media intervenor for access to sealed court transcripts and records. Johnson, 232 Ill. App. 3d at 1075. Like the case at bar, the Johnson case involved: a media intervenor; sealed court transcripts and records; a denial of access by the trial court; and claims under both the first amendment and the common law, as well as under the Clerk of the Courts Act. Johnson, 232 Ill. App. at 1071-73.

In essence, the State claims that we should follow the part of the Johnson holding that applied an "abuse of discretion" standard to common law claims, but

that we should reject the second part of that same holding that applied the same standard to first amendment claims. The State offers no rationale for splitting the holding in half, except to say that we should do it that way

In sum, the parties appear to agree that the <u>Rivera</u> standard of review applies to the first amendment claim, but differ concerning the appropriate standard for the common law and statutory claims. Neither party offers us a basis to reject this court's prior holding in <u>A.P.</u> ; or the Illinois Supreme Court's similar holding in <u>Skolnick</u>, upon which <u>A.P.</u> is based; or either part of the <u>Johnson</u> holding. <u>A.P.</u>, 354 Ill. App. 3d at 994, citing <u>Skolnick</u>, 191 Ill. 2d at 231-33; <u>Johnson</u>, 232 Ill. App. 3d at 1075 ("[u]nder either a common law or first amendment analysis")

(b) Case Law

Both parties appear to agree that <u>de novo</u> review is required for the "ultimate" decision of the first amendment claim, and cite in support a case that has nothing whatsoever to do with the first amendment. <u>Rivera</u>, 227 Ill. 2d at 11.

The question for us, however, is not what standard of review we would devise if we were writing on a clean slate; the question for us is what standard of review does our precedent require us to follow. In several prior cases, both the Illinois Supreme and Appellate Courts have applied an abuse of discretion

standard to first amendment claims, as well as to statutory and common law claims, seeking disclosure or access. For example, in <u>Skolnick</u>, our supreme court stated that "whether court records in a particular case are opened to public scrutiny rests with the trial court's discretion which must take into consideration all facts and circumstances unique to that case." <u>Skolnick</u>, 191 Ill. 2d at 231. Our supreme court made clear that this standard applied to both the first amendment and common law claims before it, when it held: "regardless of whether we proceed under a common law or a first amendment analysis, we reach the same conclusion: the trial court abused its discretion." <u>Skolnick</u>, 191 Ill. 2d at 233.[8] Accord <u>A.P.</u>, 354 Ill. App. 3d at 994 ("An order denying a motion to unseal a court file or document is reviewed for an abuse of discretion, regardless of whether a purported right of access is based on the common law or the first amendment."); <u>Johnson</u>, 232 Ill. App. 3d at 1075 ("Under either a common law or first amendment analysis, we find the trial court abused its discretion by denying access to the court

---

[8]In a footnote, our supreme court observed in <u>Skolnick</u> that at least one commentator had stated that the abuse of discretion standard applied to common law claims, but not to first amendment claims. However, our supreme court apparently rejected this position when it held, under both a first amendment and common law analysis, that the trial court "abused its discretion." <u>Skolnick</u>, 191 Ill. 2d at 232 n.2, 233, citing D. Lee, <u>Sealed Documents, Closed Hearings, and the Public's Right to Know</u>, 81 B.J. 456, 457 (1993).

records and transcripts in the two proceedings."). See also Coy v. Washington County Hospital District, 372 Ill. App. 3d at 1080 ("An order denying a motion to unseal a court file or document is reviewed for an abuse of discretion."). C.f. Zielke v. Wagner, 291 Ill. App. 3d 1037, 1040 (1997) ("Where a protective order is challenged on appeal as an unconstitutional 'prior restraint,' the trial court's decision on the matter will not be disturbed on review absent an abuse of discretion.").

A distinction between our case and the prior cases is that the prior cases were civil, while our case is criminal. In criminal cases involving denial of media access, the reviewing courts decided the first amendment issues without specifying the standard of review. For example, in Pelo, which is a criminal case, the appellate court discussed the first amendment right of access in one paragraph, and then discussed the common law right of access in a separate paragraph. Pelo, 384 Ill. App. 3d at 780-81. In the common law paragraph, the appellate court identified abuse of discretion as the correct standard of review, but without stating whether it also applied to the first amendment claim. Pelo, 384 Ill. App. 3d at 780-81. See also LaGrone, 361 Ill. App. 3d at 537 (holding that "the trial court failed to make specific factual findings" justifying closure, without stating whether it

was applying a <u>de novo</u> or abuse of discretion standard).

We do not find the civil/criminal distinction to be controlling. In civil cases as in criminal cases, the parties have a right to a fair trial, guaranteed by the due process clauses, of the fifth and fourteenth amendments of the United States constitution, and the press has a right of access. U.S. Const., amend. V (no person shall "be deprived of life, liberty, or property without due process of law"), U.S. Const., amend. XIV (no state shall "deprive any person of life, liberty, or property without due process of law"); <u>Skolnick</u>, 191 Ill. 2d at 231-32 (in this civil case, our supreme court recognized that the public had a right of access "embodied in the first amendment"). In criminal cases, the defendant also has a constitutional right to a public trial. U.S. Const., amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a *** public trial ***"). However, in both criminal and civil cases, the trial court is charged with the duty of balancing competing rights and achieving the correct balance. We see no reason to apply an abuse of discretion to civil cases and then apply a different standard in criminal cases. C.f. <u>People v. Cooper</u>, 365 Ill. App. 3d 278, 282 (2006) (applied an abuse of discretion standard to question of whether trial court violated defendant's sixth amendment right to a public trial when it excluded certain spectators).

In the case at bar, the trial court had to determine, first, whether the presumption of public access applied to this particular type of court record or proceeding. E.g., Pelo, 384 Ill. App. 3d at 783-84 (presumption of access did not apply to evidence deposition that had not yet been entered into evidence in a criminal case). This is a purely legal question, and we review purely legal questions de novo. Willeford v. Toys "R" Us-Delaware, Inc., 385 Ill. App. 3d 265, 272 (2006) (although protective orders are ordinarily reviewed for abuse of discretion, a de novo standard applied to a preceding, purely legal issue).

However, after the trial court found that the presumption applied, it had to determine whether the presumption was rebutted by other concerns. Skolnick, 191 Ill. 2d at 232 ("presumption can be rebutted"); Coy, 372 Ill. App. 3d at 1080; A.P., 354 Ill App. 3d at 995; Johnson, 232 Ill. App. 3d at 1075. In order to close the court proceeding, the trial court was required to make specific findings that rebutted the presumption and thus justified the closure. Skolnick, 191 Ill. 2d at 233 ("trial court neglected to state why it ordered" sealing of document); LaGrone, 361 Ill. App. 3d at 537 ("trial court failed to make specific factual findings"); A.P., 354 Ill. App. 3d at 996 (trial court sealed court files "without making specific findings"); Johnson, 232 Ill. App. 3d at 1075 (trial court's order must contain

"specific factual findings" in order to justify denying access). To the extent that these findings involved findings of fact, we owe deference, as an appellate court traditionally owes to a trial court's factual findings. Rivera, 227 Ill. 2d at 11; People v. Johnson, 385 Ill. App. 3d 585, 590 (2008).

In deciding to deny access to certain proceedings and records for a certain length of time, the trial court had to craft a careful and delicate balance among competing interests. LaGrone, 361 Ill. App. 3d at 535 ("balancing the right of the defendant to a fair trial against the public right of access to criminal proceedings") Coy, 372 Ill. App. 3d at 1082 ("balancing this compelling interest [of victim privacy] against the public's right of access" in a civil case); Waller, 467 U.S. at 44, 104 S.Ct. at 2215, 92 L.Ed. 2d at 38 ("the balance of interests must be struck with special care"). The trial court had "to take into consideration all facts and circumstances unique to that case" and decide the appropriate parameters of closure, namely for what proceedings and for how long. Skolnick, 191 Ill. 2d at 231; A.P., 354 Ill. App. 3d at 1002 (trial court erred by sealing the entire court file; case was remanded so trial court could determine which document required sealing, since "the determination regarding sealing a particular document *** is properly left to the trial court in the first instance"). To this balancing of interests

49

and determination of parameters, we apply an abuse of discretion standard, as required by the supreme court and appellate court cases that we have discussed above.

## (5) Presumption of Access

Next, we must determine whether the presumption of access applied to the court proceedings and records at issue. If the presumption did not apply, our analysis ends there. If the presumption did apply, then we must examine the propriety of the trial court's denial of access.

The constitutional presumption applies to court proceedings and records (1) which have been historically open to the public; and (2) which have a purpose and function that would be furthered by disclosure. Skolnick, 191 Ill. 2d at 232; Pelo, 384 Ill. App. 3d 780; Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 8, 106 S.Ct. 2735, 2740, 92 L.Ed. 2d 1, 10 (1986) (Press-Enterprise II) ("whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question"). Although the presumptions under common law and state statutory law have different sources, our supreme court has held that they are "parallel" to the first amendment presumption and thus

has analyzed the three presumptions together. Skolnick, 191 Ill. 2d at 231-33. We will do the same.

In the case at bar, the trial court closed four pretrial hearings, on (1) April 11, 2008; (2) April 15, 2008; (3) April 21, 2008; and (4) April 25, 2008. In addition, the following documents were filed under seal: (1) the State's pretrial motion to allow evidence of other crimes; (2) the State's supplemental answer to discovery; and (3) both parties' witness lists.

This issue, of the presumption's applicability to pretrial criminal proceedings, has arguably arisen, in two prior Illinois Appellate Court cases: (1) Pelo and (2) LaGrone. Compare Pelo, 384 Ill. App. 3d at 783-84 (presumption of access did not apply to pretrial deposition that had not yet been entered into evidence in the criminal trial), with LaGrone, 361 Ill. App. 3d at 536 (presumption applied to pretrial hearing to determine admissibility of certain statements in a criminal trial). Compare Northwest Newspapers v. People, 323 Ill. App. 3d 236, 242 (2001) (presumption did not apply to court proceedings authorizing a wiretap) with Waller v. Georgia, 467 U.S. 39, 47, 104 S.Ct. 2210, 2216, 81 L.Ed. 2d 31, 39 (1984) (presumption of a public trial under 6th amendment applied to a hearing to determine admissibility of wiretap evidence). See also A.P., 354 Ill. App. 3d at

No. 1-08-1728

998 (presumption applied to a civil proceeding concerning a family's asset distribution); In re Johnson, 232 Ill. App. 3d at 1074 (presumption applied to certain documents but not others in a civil case).

First, the Pelo case concerned a criminal defendant who was accused of stalking and sexually assaulting several victims. Pelo, 384 Ill. App. 3d at 777. Since a potential witness was scheduled to leave the country for military service, the parties deposed him at the courthouse. Pelo, 384 Ill. App. 3d at 777. A newspaper, which had been reporting about the case, filed a petition to intervene and to gain access to the videotape of the deposition. Pelo, 384 Ill. App. 3d at 777. The appellate court held that no presumption attached under the first amendment, the common law or the applicable Illinois statute (705 ILCS 105/16(6) (West 2006)). Pelo, 384 Ill. App. 3d at 780-81, 783-84. No presumption of access attached until, and if, the videotape was introduced into evidence and thus became part of the judicial record. Pelo, 384 Ill. App. 3d at 782-83.

Second, the LaGrone case concerned a boyfriend accused of murder when his girlfriend's three children drowned, after her vehicle sank into a lake. LaGrone, 361 Ill. App. 3d at 533. The defendant moved to bar certain hearsay

statements of one of the murder victims, and to bar certain evidence concerning his "character attributes"; and to close the hearing on these two motions. LaGrone, 361 Ill. App. 3d at 533. The Associated Press and two newspapers petitioned to intervene and to obtain access to the hearing. LaGrone, 361 Ill. App. 3d at 533. Although the trial court directed the closure of the hearing, it ruled that, " 'upon selection of the jury, the transcript of this hearing will be released.' " LaGrone, 361 Ill. App. 3d at 533. In LaGrone, the appellate court never considered whether the presumption applied. We have no way of knowing if this issue was conceded by the parties. Skipping over the question of whether the presumption applied and jumping to the question of whether the trial court appropriately balanced the presumption against other concerns, the appellate court held that the trial court failed to make the specific findings needed to rebut the presumption. LaGrone, 361 Ill. App. 3d at 537. As a result, the LaGrone case provides little guidance to us in determining whether the presumption applies.

The United States Supreme Court's opinion in Waller in instructive, because it also concerned a pretrial criminal proceeding. Although Waller concerned the defendant's sixth amendment right to a public trial, the United States Supreme Court held that the same analysis applied. Waller, 467 U.S. at 47,

104 S.Ct. at 2216, 81 L.Ed. 2d at 39; Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. at 2739, 92 L.Ed. 2d at 9.  Thus, whether a court is determining the propriety of closure under either the first or the sixth amendments, the analysis is the same.

In Waller, the United States Supreme Court held that the presumption attached to a hearing to determine the admissibility of wiretap evidence. Waller, 467 U.S. at 43, 104 S.Ct. at 2214, 81 L.Ed. 2d at 36. The State had moved to close the hearing, on the ground that it would involve persons who were indicted but not yet on trial.  Waller, 467 U.S. at 42, 104 S.Ct. at 2213, 81 L.Ed. 2d at 35-36. Over the defendant's objection, the trial court had closed the hearing, which lasted 7 days.  Waller, 467 U.S. at 42, 104 S.Ct. at 2213, 81 L.Ed. 2d at 36; see also Press-Enterprise II, 478 U.S. at 12, 106 S.Ct. at 2742, 92 L.Ed. 2d at 12 (presumption applied to preliminary hearing that lasted 41days, including both fact and scientific witnesses, who were subject to vigorous cross-examination).  The Supreme Court held that the presumption applied to a suppression hearing, reasoning that, first, in many cases, a suppression hearing will be, in effect, the only trial if the defendant subsequently pleads guilty pursuant to a plea bargain; second, that a suppression hearing often resembles a bench trial, with testimony by witnesses, arguments by counsel, and determinations by the trial court; and third,

that the need for a public hearing is "particularly strong" when the issue is suppression pursuant to the fourth amendment, since the public has "a strong interest in exposing substantial allegations of police conduct to the salutary effects of public scrutiny." Waller, 467 U.S. at 47, 104 S.Ct. at 2215-16, 81 L.Ed.2d at 39.

None of the United States Supreme Court's reasons apply here. First, in the case at bar, the defendant did not plead guilty and a full trial was held. Second, the hearings at issue bore absolutely no resemblance to the proceeding in Waller. In contrast to the Waller proceeding which resembled a full-scale bench trial, the hearings at issue concerned primarily argument by counsel, with a few questions asked by the trial court itself, to one witness, on a very limited issue. Waller, 467 U.S. at 47, 104 S.Ct. at 2215-16, 81 L.Ed.2d at 39; see also Press-Enterprise II, 478 U.S. at 7 and 12, 106 S.Ct. at 2740 and 2742, 92 L.Ed. 2d at 9 and 12 (presumption of access applied to a California preliminary hearing since it "functions much like a full-scale trial"). Third, in the case at bar, the hearings did not concern allegations of police misconduct, which carry a "particularly strong" need for public scrutiny. Waller, 467 U.S. at 47, 104 S.Ct. At 2216, 81 L.Ed.2d at 39.

Applying  Pelo and Waller to the proceedings and records before us, we find that the presumption did not attach to the hearings, to the State's motion concerning potential evidence, to the State's discovery, or to the parties' witness lists.  As in Pelo, the media intervenors did not have a right to a potential exhibit that had not yet been introduced into evidence; similarly, in the case at bar, the media intervenors did not have a right to discovery, other crimes' evidence, or a list of witnesses, because none of it had been introduced into evidence. Pelo, 384 Ill. App. 3d at 782-83. As already discussed, the hearings at issue bore no resemblance to the hearing in Waller, where the presumption of access applied. Waller, 467 U.S. at 43, 104 S.Ct. at 2214, 81 L.Ed. 2d at 36.

In addition, we find that the subject matter of these proceedings are not ones that have been historically open to the public or which have a purpose and function that would be furthered by disclosure. Skolnick, 191 Ill. 2d at 232; Pelo, 384 Ill. App. 3d 780; Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. at 2740, 92 L.Ed. 2d at 10. The proceedings at issue here concerned primarily: (1) questionnaires for potential jurors; and (2) the State's other crimes evidence.

First, the media intervenors have not cited a case for the proposition that juror questionnaires have historically been made public, prior to their use.  The

questioning and selection of jurors has historically been open to the public. Press-Enterprise v. Superior Court of California (Press-Enterprise I), 464 U.S. 501, 505, 104 S.Ct. 819, 821, 78 L.Ed. 2d 629, 635 (1984) (presumption of access applies to voir dire questioning and selection of jurors). However, we have not been presented with a case that the presumption applies to counsel's argument concerning what questions those jurors should be asked. C.f. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 598 n.23, 100 S.Ct. 2814, 2839, 65 L.Ed. 2d 973, 1004 (1980) (Brennan, J., concurring) ("when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle"); Reynolds, 274 Ill. App. 3d at 698 ("a denial of contemporaneous access to sidebar conferences" is not appealable). Making the questions public to the very pool from which the jurors are about to drawn would completely undermine their function, of eliciting honest and unrehearsed responses from the potential jurors. Press-Enterprise I, 464 U.S. at 511 n.9, 104 S.Ct. at 825 n.9, 78 L.Ed. 2d at 639 n.9 (purpose of questioning potential jurors is "to ensure a fair impartial jury").

Second, the States' other crimes evidence has historically not been accessible to the public prior to its introduction at trial. Pelo, 384 Ill. App. 3d at

782-83 (potential evidence does not carry a presumption of access until its use in court). In addition, the function of the hearing could be undermined, if the public and potential jurors received access to the information, even if the trial court ruled that the state was not entitled to use it. Although the Unites States Supreme Court held that this reason did not "automatically" justify refusing access specifically in the case of fourth amendment suppression hearings or California preliminary hearings, it found that public access to an admissibility hearing posed "special risks of unfairness," where publicity could undermine "the whole purpose of such a hearing" which is "to screen out unreliable or illegally obtained evidence." Press-Enterprise II, 478 U.S. at 14-15, 106 S.Ct. at 2743, 92 L.Ed. 2d at 14.

For these reasons, we find that the presumption of access did not apply.

(6) Trial Court's Findings

Even if we were to find that the presumption of access applied to these pretrial proceedings and related documents, we could not find that the trial court abused its discretion in balancing the competing interests at stake here and crafting appropriate parameters.

A holding that the presumption applies is only one step in the analysis. The presumption provides only a qualified right of access. Press-Enterprise II, 478

U.S. at 9, 106 S.Ct. at 2740, 106 S.Ct. at 10 ("even when a right of access attaches, it is not absolute;" it is a "qualified" right). That right still must be balanced against competing interests, such as the defendant's right to a fair trial and the privacy right of a victim, who was both an alleged sex crime victim (Press-Enterprise II, 478 U.S. at 10 n. 2, 106 S.Ct. at 2741 n.2, 106 S.Ct. at 11n.2 ("The protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding.")) and a minor at the time of the alleged acts. A.P., 354 Ill. App. 3d at 998 (a trial court must exercise "great care" when faced with a media petition for access in a case involving a minor).

If the presumption applies to a certain type of proceeding or record, the trial court cannot close this type of proceeding or record, unless it makes specific findings demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve those values. Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. at 2743, 92 L.Ed. 2d at 13-14; Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. at 824, 78 L.Ed. 2d at 638. If the value asserted is the defendant's right to a fair trial, then the trial court's findings must demonstrate, first, that there is a substantial probability that defendant's trial will be prejudiced by publicity that

closure will prevent; and second, that reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights. Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. at 2743, 92 L.Ed. 2d at 13-14.

### (a) Trial Court's Declaration of Reasons

In the case at bar, the trial court articulated its reasons both in writing and orally in court. On April 11, in open court, the trial court apparently made a statement that it was closing the proceeding due to the proximity of jury selection and the impact that it could have on potential jurors. On April 15, in open court, the trial court stated that the State's motion had been filed under seal "because of the proximity of Mr. Kelly's case going to trial." On April 24, in open court, the trial court explained that it could not "disclose the factual basis" for closure without compromising the very interest that the closed proceeding sought to protect. However, the trial court did state that "the generalized basis" was "the proximity of jury selection, which is in about two weeks, and the chance that this might deprive Mr. Kelly of a fair trial." On April 25, during the first closed hearing after the intervenors' motion, the trial court elaborated on its reasons, which it had mentioned briefly, in open court the day before. Then, after the state and the defendant received time to respond, as they had both requested, the trial

court issued on May 16, 2008, a detailed, public, 8-page order that explained the need for closure.

The media intervenors criticize the trial court for failing to make a formal declaration of reasons, prior to closing the first proceeding on April 11. However, from the record before us, we cannot tell whether the trial court did, or did not, make findings before closing the proceeding. The record on appeal contains only an excerpt from the April 11 proceeding. The appellants failed to provide us with the transcript of the open portion of the April 11 proceeding, which would have revealed whether the trial court did, or did not, make a formal declaration of reasons before it cleared the public and the press from the courtroom.

The burden is on the appellant to provide a reviewing court with a complete record. "It is well settled that any doubts arising from the incompleteness of the record will be resolved against the appellant, as it is the burden of the appellant to provide a sufficiently complete record to support at claim of error." Poliszcuk v. Winkler, 387 Ill. App. 3d 474, 494 (2008), citing Trusero Corp. v. Ernst & Young L.L.P., 376 Ill. App. 3d 218, 225 (2007).

Even if the transcript of the open proceedings did not contain a formal declaration of reasons, we cannot fault the trial judge. It is absurd to expect a trial

court to issue a formal declaration, when the parties did not object to closure, when the media had not yet filed a motion objecting to closure, and when the presumption of access did not even apply to that proceeding.

In addition, the reasons for closure are obvious from the record. The purpose of requiring a trial court to make findings is to facilitate appellate review. Press-Enterprise II, 478 U.S. at 9-10, 106 S.Ct. at 2741, 92 L.Ed. 2d at 11 (the findings must be "specific enough that a reviewing court can determine" the propriety of closure); A.P., 354 Ill. App. 3d at 997 ("[a]dequate findings relieve the appellate courts of having to grope through the record"). Although we require a trial court to make specific factual findings to justify closing a proceeding, a reviewing court may affirm the closure even if the trial court failed to make a "formal declaration" of findings, if the reasons are both obvious from the record and sufficient to justify closure. People v. Holveck, 141 Ill. 2d 84, 100 (1990); A.P., 354 Ill. App. 3d at 997 (after holding that the trial court's findings were not sufficiently "specific," we conducted "[o]ur own review" of the record).

In the case at bar, we find both that the trial court articulated its reasons orally in court and in writing; and that the reasons are also obvious from the record.

(b) Trial Court's Balancing of Interests

Even if the presumption of access applied, we could not find that the trial court abused its discretion in balancing the competing interests, in light of the unique facts and circumstances of this case.

First, this is a case where the defendant asserted his right to a fair trial, claiming that opening these particular proceedings would violate that right. The defendant asserted his right in briefs filed both before our supreme court and before the trial court. Thus, the defendant's sixth amendment right to a public trial was not at issue; and if the trial court had opened the proceedings, it would have had to do so over the defendant's voiced concerns for his constitutional right to a fair trial. Waller, 467 U.S. at 47 and 46 n.6, 104 S.Ct. at 2216 and 2216 n.6, 81 L.Ed. 2d at 39 and 39 n.6 (noting the need for defendant to object to closure to trigger an analysis of his sixth amendment right to a public trial, and the difficulties of closing a proceeding over defendant's objection). This court is confident that if defendant Kelly had been convicted, we would be presented with an allegation by the defendant that a media-circus atmosphere precluded him from receiving a fair trial. Waller, 467 U.S. at 46, 104 S.Ct. at 2215, 81 L.Ed. 2d at 38 ("[t]he central aim of a criminal proceeding is to try the accused fairly"); Press-

No. 1-08-1728

Enterprise I, 464 U.S. at 508, 104 S.Ct. at 823, 78 L.Ed. 2d at 637 ("No right ranks higher than the right of the accused to a fair trial.")

Second, this is a case described by the media intervenors themselves as attracting media "hordes." In a newspaper article attached as an exhibit to defendant Kelly's objections, one of the intervenors wrote that "[c]elebrity-obsessed culture will turn its eyes toward the R. Kelly trial next month" and that "hordes of reporters and cameramen [are] expected to descend" on the courthouse. The front-page article also stated: "More than 330 reporters have expressed interest in covering the case with news agencies from as far away as France, Japan, Australia and England indicating they'll attend." Thus, the intense coverage of this case by the media is an undisputed fact. Nebraska Press Assn. v. Stuart, 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed. 683, 699 (1976) (to assess "the probable extent of publicity," the trial court properly relied on "newspapers demonstrating that the crime had already drawn intensive news coverage").

Third, this case concerned an alleged sex crime victim, who was also a minor at the time of the alleged crime. Protecting the privacy interests of both sex crime victims and minors is a paramount concern of the courts. Concerning sex crime victims, the United States Supreme Court has stated, "[t]he protection of

64

victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding." Press-Enterprise II, 478 U.S. at 10 n.2, 106 S.Ct. at 274 n.2, 92 L.Ed. 2d at 11 n.2. Concerning minors, this court has stated that a trial court must exercise "great care" when faced with a media petition for access in a case involving a minor. A.P., 354 Ill. App. 3d at 998. The minor is entitled to the court's "tenderest consideration." A.P., 354 Ill. App. 3d at 998. In the case at bar, where the minor was alleged to have participated in three-way sex, lesbian sex and other various sex acts, the trial court was justly concerned with protecting the alleged victim, who was a minor at the time of the acts.

Fourth, the trial court's attempt to strike a careful balance was evident, not only from the concerns that it expressed several times in court and in writing on this subject, but also from the fact that it had previously denied the motions of both the defense and the prosecution to prohibit the public from viewing the videotape in open court.

Fifth, the trial court considered several alternatives to closure. A trial court may resort to closure only if "reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." Press-Enterprise II, 478 U.S. at 14, 106

S.Ct. At 2743, 92 L.Ed. 2d at 14; Press-Enterprise I, 464 U.S. at 511, 104 S.Ct. at 825, 78 L.Ed. 2d at 639 ("[a]bsent consideration of alternatives to closure, the trial court could not constitutionally close the voir dire"). In the case at bar, the trial court considered the alternatives of: (1) redacting; (2) using a pseudonym; (3) questioning potential jurors during voir dire; and (4) changing the venue of trial. Nebraska Press, 427 U.S. at 563-64, 96 S.Ct. at 2805, 49 L.Ed. at 700 (discussing alternatives such as changing venue and voir dire). Rejecting these alternatives, the trial court explained that redaction and use of pseudonyms would result in "a collection of unintelligible nonsense," and that neither voir dire questions nor a venue change could protect the defendant's right to a fair trial, in light of the highly prejudicial details of the crime, the onslaught of pretrial publicity, the national and international media attention, and the proximity of jury selection. Although "voir dire is the preferred method for guarding against the effects of pretrial publicity," we have recognized that there are "circumstances" where voir dire cannot remove the taint. LaGrone, 361 Ill. App. 3d at 537; Press-Enterprise II, 478 U.S. at 15, 106 S.Ct. at 2743, 92 L.Ed. 2d at 14 (normally, voir dire can "identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict").. These "rare cases" occur when there has been

media saturation, as the trial court found in the case at bar. See LaGrone, 361 Ill. App. 3d at 537.

In addition, the trial court's findings in the case at bar share little resemblance with the findings in LaGrone, which the appellate court found to be inadequate. In LaGrone, the trial court failed to "provide[] this [appellate] court with sufficient factual material"; and the trial court made "no mention of alternatives to closure other than to state that there were none." LaGrone, 361 Ill. App. 3d at 536-37. By contrast, in the case at bar, the trial court did provide us with factual material, such as the fact that over 330 reporters had applied for media credential to cover this case, and that the case had been on the front page of both major Chicago newspapers, numerous times in just the prior three weeks. Also, in the case at bar, the trial court carefully considered several different alternatives to closure and explained why each one would not work in the unique circumstances of this case. Thus, the findings in the case at bar share little resemblance with the inadequate findings in LaGrone.

For these reasons, we find that, even if the presumption applied, the trial court did not abuse its discretion in striking a balance among the competing interests of the defendant's right to a fair trial, the public's right of access, and the

privacy right belonging to the victim as both a minor and an alleged sex crime victim. We make our analysis based on the unique facts of this case, acknowledging the rights of the media to free speech and to provide a free press.

(7) Decorum Order

The media intervenors challenge the Decorum Order as a prior restraint on free speech. Kenner v. Monsanto Co., 112 Ill. 2d 223, 246 (1986). Like the closed proceedings and records, the Decorum Order raises several preliminary issues that we must decide, before reaching the substantive issue of prior restraint.

(a) Preliminary Issues

The preliminary issues are: (1) standing; (2) jurisdiction under Supreme Court Rule 307; and (3) the public interest exception to the mootness doctrine.

First, the issue of standing was raised at the oral argument of this appeal, with respect to the Decorum Order. Standing is not an issue in this case. Standing is an affirmative defense which, if not raised by the opposing party, is waived. The Illinois Supreme Court held in Skolnick – which was a right of access case like the case at bar -- that "standing is an affirmative defense" which is waived if not raised. Skolnick, 191 Ill. 2d at 237; Raintree Homes, Inc. v. Village of Long Grove, 209 Ill. 2d 248 (2006) ("Lack of standing is an affirmative matter that may

No. 1-08-1728

be raised as a ground for dismissal under a section 2-619 motion to dismiss.").

The supreme court in Skolnick seemed to be critical of the appellate court for

raising this issue, seemingly sua sponte. Skolnick, 191 Ill. 2d at 237. In the case

at bar, since the issue was not raised, either at the trial level or in the appellate

briefs, it was waived for purposes of this appeal.

Second, as previously discussed, Supreme Court Rule 307 permits an appeal

from "an interlocutory order of [a trial] court *** refusing to dissolve or modify an

injunction." 188 Ill. 2d R. 307(a)(1).[9] In the case at bar, the Decorum Order

enjoined the parties' attorneys and witnesses from speaking on certain topics. The

trial court's May 16 order "refus[ed] to dissolve or modify" this injunction, as

Supreme Court Rule 307 requires. Thus, the language of Rule 307 permits this

appeal. Kenner, 112 Ill. 2d at 235, 242 (an interlocutory appeal from a " 'gag' "

order was permitted "[p]ursuant to Rule 307"); In re J.S., a Minor, 267 Ill. App. 3d

145, 147 (1994) (a "gag order" directed to the parties and their attorneys "is

properly the subject of an interlocutory appeal under Supreme Court Rule

---

[9]This court has previously defined the term "injunction," in Rule 307(a), as a prohibitive, equitable remedy that forbids a party from doing some act that he or she is threatening or attempting to commit. Pelo, 384 Ill. App. 3d at 779, quoting Reynolds, 274 Ill. App. 3d at 698, quoting Black's Law Dictionary, 705 (5th ed. 1983).

69

307(a)(1)"). See also <u>Skolnick</u>, 191 Ill. 2d at 221-22 (an order prohibiting a party from disseminating information was properly reviewed under Rule 307). While the Decorum Order did not purport to enjoin the media intervenors, the issue of standing was waived, as discussed above. See also <u>J.S.</u>, 267 Ill. App. 3d at 152 ("the gag order constitutes an indirect restraint on the press"); <u>Gentile v. Nevada</u>, 501 U.S. 1030, 1056, 111 S.Ct. 2720, 2735, 115 L.Ed. 2d 889, 911 (1991) ("[b]ecause attorneys participate in the criminal justice system and are trained in its complexities, they hold unique qualifications as a source of information about pending cases *** [upon which] the press and public rely").

Third, like the closed proceedings and records, the Decorum Order also qualifies for the public interest exception to the mootness doctrine. As previously stated, the public interest exception requires: (1) a question of " 'a public nature' "; (2) the need for a determination to " 'guide[] public officers' ": and (3) a question that is " 'likely to recur'." <u>Filliung</u>, 387 Ill. App. 3d at 56, quoting <u>Brown</u>, 361 Ill. App. 3d at 134. First, the Decorum Order involves a question of "a public nature," since it concerns when and if certain information will become "public." Second and third, there is a need to guide "public officers," i.e., trial judges; and the question will certainly recur, since the trial court has used this

same Decorum Order before and presumably will continue to use it, until and unless we, the reviewing court, say not to use it again. In its May 16 order, the trial court observed that "this same decorum order was used during the trial of People v. Luna, (02CR 15430) *** which was covered extensively by" the same media intervenors. The Luna case was a case of local notoriety, that involved murders at a "Brown's Chicken" restaurant. Thus, not only did this same Decorum Order recur, it recurred against these same media intervenors. For these reasons, we find that the public interest exception permits us to hear an appeal, from the portion of the May 16 order that concerned the Decorum Order.

On the preliminary issues, we find that: (1) any objections to standing were waived; (2) we have jurisdiction under Supreme Court Rule 307; and (3) the public interest exception applies. Thus, we may proceed to the substantive issue concerning the Decorum Order, which is whether it constituted an unconstitutional prior restraint on freedom of speech.

(b) Prior Restraint

The media intervenors claim that the Decorum Order was an unconstitutional "prior restraint on [the] freedom of speech" of the parties' attorneys. Kenner, 112 Ill. 2d at 246 ; J.S., 267 Ill. App. 3d at 148 ("A prior

restraint is a 'predetermined judicial prohibition restraining specified expression' "). Although the Decorum Order was also directed at the parties' witnesses, the appellate briefs of the media intervenors discuss only the restraint of the attorneys' speech. Thus, we will limit our analysis to that topic as well.

The media intervenors claim that this prior restraint was unconstitutional, because the trial court failed to make findings to justify it. Kenner, 112 Ill. 2d at 244. In Kenner, the Illinois Supreme Court held, before a trial court could restrain attorneys from making extrajudicial comments "about a pending civil trial," it had to make "specific findings" that the attorneys' "conduct pose[d] a clear and present danger or a serious and imminent threat to the fairness and integrity of the trial." (emphasis in original). Kenner, 112 Ill. 2d at 244. After Kenner, the Illinois Supreme Court redrafted the rule governing attorney conduct and pretrial publicity, in order to clarify, in advance, what subjects would pose this "serious and imminent threat to the fairness of the proceeding." 188 Ill. 2d R. 3.6.

The trial court's Decorum Order tracks closely, in substance if not in language, to Rule 3.6 (b) of the Illinois Rules of Professional Conduct. 188 Ill. 2d R. 3.6. The Rules of Professional Conduct comprise Article VIII of the Illinois Supreme Court Rules; and they govern the conduct of attorneys in Illinois courts.

"Violation of these rules is grounds for discipline." 134 Ill. 2d Art. 7, Preamble.

Rule 3.6 governs the conduct of Illinois attorneys with respect to "trial publicity." 188 Ill. 2d R. 3.6. In the case at bar, none of the parties have argued that we should find Rule 3.6 unconstitutional.[10] In fact, both sides cite Rule 3.6 in support of their arguments, with the media intervenors arguing that the Decorum Order was broader than Rule 3.6 and the state arguing that it was not. Thus, to the extent that the Decorum Order tracks Rule 3.6(b), it is proper.

Subsection (b) of Rule 3.6 provides a list of subjects that should not be discussed outside of court, because their discussion "would pose a serious and imminent threat to the fairness" of a jury proceeding. 188 Ill. 2d R. 3.6 (b). Subsection (b) provides in full:

---

[10]In 1991, the United States Supreme Court found unconstitutional Nevada's trial publicity rule. Gentile v. State Bar of Nevada, 501 U.S. 1030, 115 L.Ed. 2d 888, 111 S.Ct. 2720 (1991) (plurality opinion). After the Gentile opinion, the American Bar Association and a number of states redrafted their trial publicity rules. Alberto Bernabe-Riefkohl, Silence Is Golden: The New Illinois Rules on Attorney Extrajudicial Speech, 33 Loy. U. Chi. L. J. 323, 326 (2002). The Illinois Supreme Court adopted in 1999 the version, which is quoted below. 188 Ill. 2d R. 3.6. A group of Illinois state prosecutors then challenged the rule in federal court, claiming that it violated the first amendment. Devine v. Robinson, 131 F.Supp. 963, 964 (2001). The federal district court dismissed the suit on the ground that plaintiffs had failed to show "an immediate threat of injury." Devine, 131 F.Supp. at 968. The federal court also found that Rule 3.6 "may be fairly interpreted in a manner that complies with the First Amendment." Devine, 131 F.Supp. at 969.

"(b) There are certain subjects which would pose a serious and imminent threat to the fairness of a proceeding, particularly when they refer to a civil matter triable to a jury or a criminal matter. These subjects relate to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

(2) in a criminal case, the possibility of a plea of guilty to the offense or the existence or contents of a confession, admission, or statement given by a defendant or suspect or that person's failure to make a statement;

(3) the performance or results of any examination or test or the failure of a person to submit to an examination or test, or the nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case;

(5) information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial; or

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent unless proven guilty."  188 Ill. 2d R. 3.6 (b).

Effective January 1, 1010, the Illinois Supreme Court removed subsection (b) from the text of the rule and moved it, almost <u>verbatim</u>, to the Committee Comments that accompany the rule.  This change has no effect on our analysis since subsection (b), as quoted above, was in effect in 2008, at the time of the <u>Kelly</u> trial.

A section by section comparison of the Decorum Order with Rule 3.6(b) shows their similarity.  The first section of the Decorum Order prohibited the dissemination of any "extrajudicial statement" of the defendant or witnesses.  This

section is similar to Rule 3.6(b)(2) which concerns the dissemination of a "statement given by a defendant or suspect." and to Rule 3.6(b)(1) which concerns the release of a witness's identity or "expected testimony."

The second and third sections of the Decorum Order concerned the release or discussion of exhibits whose admissibility the trial court had yet to determine. These sections correspond to Rule 3.6(b)(5), which concern "information" that a lawyer "reasonably should know is likely to be inadmissible as evidence in a trial."

The fourth section of the Decorum Order concerned expressing an opinion about guilt or innocence. This section is similar to Rule 3.6(b)(4) which concerned "any opinion as to the guilt or innocence of a defendant or suspect in a criminal case."

The fifth section of the Decorum Order concerned testimony that was "given or is expected to be given in any proceeding relating to this matter." This section is similar, in part, to Rule 3.6(b)(1), which concerns "the expected testimony of a party or witness." This section is different, in that it also concerns testimony that was already "given" at trial

The sixth section concerns the "identity of any prospective witness, or the

witness's probable testimony." This section is similar to Rule 3.6(b)(1), which concerns a witness' "identity" and "expected testimony."

The seventh section concerns "the nature" of "any purported evidence alleged to have been accumulated as a result of the investigation of this matter." This section is similar to Rule 3.6(b)(3) which concerns "the nature of physical evidence to be presented."

Thus, with the exception of testimony already "given" at trial, the substance of the Decorum Order tracked Rule 3.6. The media intervenors offer no explanation of how they were prejudiced by a lack of attorney statements describing trial testimony, which was already given and made public. We cannot find a first amendment violation based on that section alone. Zielke, 291 Ill. App. 3d at 103-104 (appellants "are unable to articulate any prejudice that they have suffered" from the alleged prior restraint on speech).

For these reasons, we find that the trial court's Decorum Order was not an abuse of discretion by the trial court. J.S., 267 Ill. App. 3d at 148 ("In determining whether the circuit court abused its discretion" in restraining the speech of parties and their attorneys, "we will not compare what we might have done with what the [trial] court did."); see also Zielke, 291 Ill. App. 3d at 1040 ("[w]here a protective

order is challenged on appeal as an unconstitutional 'prior restraint', the trial court's decision on the matter will not be disturbed on review absent an abuse of discretion."); Skolnick, 190 Ill. 2d at 224. However, in the future, it may be the better practice for Illinois trial courts simply to use the exact language of Rule 3.6(b) when drafting a Decorum Order, if they felt one was needed.

CONCLUSION

For the foregoing reasons, we affirm the trial court's orders. We find: (1) that a petition to intervene was the appropriate vehicle to seek access to sealed court proceedings and records; (2) that appellate jurisdiction under Supreme Court Rule 307 was proper to review the trial court's order denying access and confirming the Decorum Order; (3) that the public interest exception to the mootness doctrine allowed us to hear this appeal; (4) that we review de novo the question of whether a presumption of access applied to this type of proceeding, and we review for an abuse of discretion the trial court's balancing of competing interests and determining the appropriate parameters of closure; (5) that the presumption of access did not apply to the pretrial proceedings and documents at issue here; (6) that, even if the presumption did apply, the trial court did not abuse its discretion; and (7) that the

Decorum Order was not an abuse of discretion.

Affirmed.

J. GORDON and McBRIDE, JJ., concur.